1
2
3
4
5
6               **UNITED STATES DISTRICT COURT**
7                     **DISTRICT OF NEVADA**
8

9   UNITED STATES OF AMERICA,              )
                                           )
10                          Plaintiff,     )    Case No.  2:06-cr-00234-PMP-GWF
                                           )
11  vs.                                    )    **FINDINGS & RECOMMENDATIONS**
                                           )
12  JONATHAN LEON TOLIVER and              )
    DONNIE BRYANT,                         )
13                                         )
                            Defendants.    )
14  _____)

15          This matter is before the Court on Defendant Jonathan Leon Toliver's Motion to Suppress (#33)

16  (filed in Case No. 2:04-CR-482-RCJ-GWF), filed on October 17, 2005; the Government's Response to

17  Defendant's Motion to Suppress (#50), filed on February 3, 2006; Defendant's Reply to Prosecution's

18  Response to Motion to Suppress (#64), filed on March 8, 2006; the Government's Supplemental

19  Response to Defendant's Motion to Suppress (#99), filed on June 6, 2006; Defendant's Supplement to

20  Motion to Suppress (#137), filed on October 19, 2006; the Government's Second Supplemental

21  Response to Defendant's Motion to Suppress (#140), filed on November 2, 2006; and Defendant's

22  Reply to Prosecution's Second Supplemental Response to Motion to Suppress (#144), filed on

23  November 15, 2006.

24          Defendant Jonathan Toliver was indicted on December 14, 2004 in Case No. 2:04-cr-482- RCJ

25  (GWF).  The Indictment alleged that Defendant was a member of the Gerson Park Kingsmen ("GPK"),

26  whose members engaged in acts of violence, including murder, threats of murder, attempted murder,

27  robbery and drug trafficking.  The Indictment alleged that Defendant Toliver murdered Gilbert Henry

28  and that he conspired with others to murder Jarbirey Carter, and attempted to murder Jarbirey Carter,

1    Kissie Allen, Phyllis Fairley, Quentin Sturgeon and Paul Marigny.  The Indictment charged Defendant

2    with violence in aid of racketeering enterprise-murder in violation of 18 U.S.C. § 1959; use of a firearm

3    during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) and 924(j)(1) and (2);

4    conspiracy to murder in violation of NRS 199.480, NRS 200.030 and 18 U.S.C. § 1959(a)(5);

5    attempted murder in violation of NRS 193.330, NRS 200.030 and 18 U.S.C. § 1959(a)(5); and assault

6    with a dangerous weapon in violation of NRS 200.471 and 18 U.S.C. § 1959(a)(3).

7         After the Court conducted an evidentiary hearing on Defendant Toliver's Motion to Suppress

8    (#33) in Case No. 2:04-CR-482-RCJ (GWF) on September 7, 2006, Defendant Toliver was indicted in

9    a Superceding Criminal Indictment (#18) filed in Case No. 2:06-CR-234-PMP-GWF on October 24,

10   2006, which charges him with substantially the same crimes in Case No. 2:04-CR-482-RCJ (GWF).[1]

11   Case No. 2:04-CR-482-RCJ (GWF) was transferred to Judge Pro on December 13, 2006, *Order (#156),*

12   and the Indictment in that case was dismissed on December 13, 2006.  *Minutes of Proceedings (#48),*

13   Case No. 2:06-CR-234-PMP-GWF.  The issue raised in Defendant's Motion to Suppress are still at

14   issue in Case No. 2:06-CR-234-PMP-GWF.  Accordingly, the Court hereby issues its Findings and

15   Recommendations regarding Defendant's Motion to Suppress (#33) for purposes of the Superceding

16   Indictment pending against him in Case No. 2:06-CR-234-PMP-GWF.

17   **FACTS**

18        Defendant moves to suppress statements made by him in an interview with the police on

19   October 7, 2004 on the grounds that he was in custody at the time of the interview and his statements on

20   that date and in subsequent in-custody interviews were obtained in violation of the Fourth Amendment

21   and in violation of his *Miranda* rights under the Fifth Amendment.  Defendant also seeks to suppress

22   in-custody statements made by him on January 15, 2005 and January 18, 2005 on the grounds that his

23   *Miranda* rights were violated.  In addition, Defendant seeks to have all three of his statements

24   suppressed for all purposes at trial based on the officers' alleged intentional violations of his *Miranda*

25   rights.

26   

27       [1]The Superceding Indictment in Case No. 2:06-CR-234-PMP-GWF identifies the criminal organization with which Defendant was allegedly associated as "Squad Up" as opposed to the "Gerson

28   Park Kingsmen" in the Indictment in Case No. 2:04-CR-482-RCJ (GWF).

1        **1.        Defendant's October 7, 2004 Interview.**

2        Detective Michael Bodnar has been a police officer with the North Las Vegas Police

3   Department for 17 years.  He has been a homicide detective for the past seven years.  Since October

4   2004, he has also been a member of a multi-agency gang task force, which includes the FBI.  Although

5   not a member of the gang task force prior to 2004, Detective Bodnar testified he has worked with the

6   task force in investigations since 2001.

7        Detective Bodnar testified that Gilbert Henry was the victim of a homicide committed in North

8   Las Vegas, Nevada on September 13, 2004.  By the following day, Defendant Toliver had become a

9   suspect in the homicide.[2]  Detective Bodnar subsequently learned that Defendant Toliver had been

10  arrested by school police on September 27, 2004 for a misdemeanor charge of loitering and was being

11  held in the City of Las Vegas Jail located at Stewart Avenue and Mohave Street in Las Vegas, Nevada

12  ("Stewart-Mohave Jail").  Detective Bodnar contacted the jail and asked to be notified when Defendant

13  Toliver was scheduled to be released because he wished to speak with him.  He testified that the

14  Stewart-Mohave Jail notified him on the afternoon of October 7, 2004 that Defendant Toliver was

15  scheduled to be released that day at approximately 4:00 p.m.

16        Detective Bodnar and his partner, Detective Robert Tanner, proceeded to the Stewart-Mohave

17  Jail on October 7, 2004.  Detective Bodnar testified that in order to enter the jail facility, his vehicle

18  was admitted through a gate into a secure area.  He and Detective Tanner left their guns in the car and

19  then proceeded to the booking area of the jail.  Detective Bodnar testified that upon arriving in the

20  booking area, he observed Defendant Toliver sitting on a bench.  According to Detective Bodnar,

21  Defendant Toliver was not handcuffed when he initially observed him.  Detective Bodnar testified that

22  Defendant was still in custody and was in the process of being released.  Detective Bodnar testified that

23  rather than waste time (presumably in dealing with the jail personnel regarding Defendant's release):

24  . . .

25

26        [2]Detective Bodnar testified that he met Mr. Toliver in 2002 when Mr. Toliver was a victim of a

27  shooting.  He had numerous conducts with Mr. Toliver during that time.  *Hearing Transcript*, page
    12:11-18.

28

3

> I went back and asked him if he would be willing to come down to the
> police department and I offered to give him a ride.  Told him we wanted
> to talk to him about some shootings that were going on and he accepted.
> And I told him once we were done we would go ahead and take him
> wherever he wanted or I'd give him a ride home.

*Hearing Transcript*, page 13:17-22.

According to Detective Bodnar, Defendant stated that he would be glad to go with the officers.

*Id.,* page 13:23-24.

The Government also called Detective Robert Tanner as a witness at the hearing.  Detective Tanner is now retired, but was employed by the North Las Vegas Police Department for 36 years and was the detective in charge of the investigation regarding the Gilbert Henry homicide.  In contrast to Detective Bodnar's testimony, Detective Tanner testified that upon entering the jail, the jailer went into the back area and brought Defendant Toliver out to the detectives.  He stated that while the detectives were waiting for Defendant to be brought out, Detective Bodnar signed forms for the release of Defendant's property.  Detective Tanner testified that upon meeting Defendant Toliver, he and Detective Bodnar told Defendant as follows:

> We said, look, you know, we'd like to talk to you about some shootings
> that have occurred and we'd like to know if you'd come down to the
> police department and talk to us about it.  You'll not be arrested, your not
> under arrested (sic), and we have no - - and we're not going to arrest you
> at any time, you know.  He said, yeah, I'll go with you.  So we went
> ahead to the police department.  He was never handcuffed.  He rode in the
> front seat, I rode in the back, and when we got to the police department
> since Detective Bodnar had a rapport with the individual I let him go
> ahead and talk to him and I went to an interview room where the cameras
> were at and the videotapes, and we had a television set up.

*Hearing Transcript*, page 104:8-19.

Detective Bodnar testified that it could have taken several hours for Mr. Toliver to actually be released from the jail.  He testified that he was not aware that the jail did not release inmates from the Stewart-Mohave facility itself, but were instead transported to downtown Las Vegas where they were released to the street.  An October 7, 2004 Stewart-Mohave Jail Release Authorization for Defendant Toliver, *Government Exhibit "1",* was admitted into evidence.  The Release Authorization stated:

> The above inmate is to be released on October 7, 2004, at 16:00.  The
> reason for release is court proceedings O/R.  The inmate is to be released
> to the streets.

4

1    The Release Authorization was signed by Detective Bodnar on the line adjacent to the words

2  "Inmate Received By:"  *Government Exhibit "1."*

3    The Defendant called Bennett Vega as a witness.  Ms. Vega is employed by the City of Las

4  Vegas, Department of Detention Enforcement and works at the Stewart-Mohave Jail.  She has been

5  employed by the Department for eight years and is familiar with the operations of the jail.  Ms. Vega

6  testified that after an inmate appears in court and is ordered to be released from the Stewart-Mohave

7  Jail, he is brought back to the jail housing unit until the release paperwork is processed. The inmate is

8  then taken to the property department and provided with the property taken from him at the time he was

9  admitted to jail and changes into his street clothing.  Because the Stewart-Mohave Jail is located in a

10 residential area, inmates are not directly released "to the street" from that facility.  Instead, inmates who

11 are ready to be released are placed in a holding facility and held in custody until a transport van is

12 available to take them downtown to First and Lewis Streets where they are released "to the street."

13   Ms. Vega testified that the jail waits until there are a group of inmates ready for transport and

14 then takes them downtown.  On October 7, 2004, vans transported inmates downtown at 1:30 p.m.,

15 9:23 p.m. and 10:17 p.m.   Ms. Vega testified that Defendant Toliver was ordered released at 4:00 p.m.

16 on October 7, 2004.  He was taken from his housing unit to the property department to receive his

17 property at approximately 6:44 p.m. and would have then been held in a holding area until a van was

18 ready to transport him downtown.  Ms. Vega testified that, on occasion, inmates are released to other

19 law enforcement officers.  In this case, Defendant Toliver was released to Detective Bodnar at

20 approximately 6:44 p.m.  If Defendant Toliver had not been released to Detective Bodnar, he would

21 presumably not have been transported downtown and released until after 9:23 p.m. that day.

22   Detective Bodnar testified that after the release paperwork was completed and Mr. Toliver

23 received his property, the detectives escorted him to their police vehicle.  Detective Bodnar stated that

24 Defendant Toliver got into the vehicle and the officers then drove out of the jail facility and proceeded

25 to the North Las Vegas Police Department.  The parking lot at the North Las Vegas Police Department

26 is secured by a fence and automatically locked gate.  Once inside the police department building,

27 Defendant Toliver passed through two secure doors.  He presumably would not have been able to walk

28 out of the building without being allowed or escorted out by police personnel.

1    At the time of his release from the Stewart-Mohave Jail, Mr. Toliver received a bag containing

2  his personal belongings – some cash, a cell phone and other articles.  When Mr. Toliver arrived at the

3  Police Department, he brought his bag of personal belongings into the building.  The detectives took

4  Mr. Toliver to an interview room located near or adjacent to their offices.  Detective Bodnar testified

5  that Defendant's bag of personal belongings was left in the office and was not brought into the

6  interview room.  Detective Bodnar testified that the detectives put their guns away, and he took out the

7  tape recorder and proceeded to interview Mr. Toliver.

8    Detective Bodnar recorded the interview on a tape recorder.  *Defendant's Exhibit "F-2"*.  The

9  interview was also videotaped.  *Defendant's Exhibit "F-3"*.  The videotape, however, was not activated

10  by Detective Tanner until after the advice of *Miranda* rights was given.  Detective Bodnar testified that

11  the interview lasted approximately two hours, from approximately 7:45 to 9:45 p.m., which is

12  confirmed by his statements of time on the audio recording and the end time on the videotape.  *Exhibit*

13  *"F-3"*.

14    At the beginning of the interview, Detective Bodnar advised Defendant as follows:

15    Q.    Okay.  Today's date is September 7, 2004.[3]  The time is
           approximately 7:44.  Detective Michael Bodnar interviewing
16           Jonathan Toliver, um reference to 04-21732, um at the North Las
           Vegas Police Department.
17           Um, Jonathan, first of all, um, you've got the right to remain
           silent.  Anything you say can and will be used against you in a
18           court of law.  You've got a right to an attorney.  If you can't
           afford an attorney one will be appointed to you free of charge.  Do
19           you understand your rights?

20    A.    Yes sir.

21  *Defendant's Exhibit "F-1",* page 1.

22    The audio recording shows that Detective Bodnar spoke rapidly, but audibly, in reciting the

23  foregoing *Miranda* warnings to Defendant Toliver.  Defendant Toliver indicated that he understood his

24  rights.  Detective Bodnar did not, however, specifically ask Defendant whether he agreed to waive his

25

26

27    [3]The parties agree that Detective Bodnar misstated the date and that the interview actually took
28  place on October 7, 2004.

6

1  rights before proceeding with the interview.[4]  Detective Bodnar did not advise or repeat the statement

2  he and/or Detective Tanner had previously given Defendant at the  Stewart-Mohave Jail that he was not

3  under arrest.  Nor did Detective Bodnar advise Defendant Toliver at any time during the interview that

4  he was free to leave.  Detective Bodnar acknowledged that in reciting the *Miranda* warnings, he did not

5  inform Mr. Toliver that he had the right to have counsel present during questioning.

6  The video tape shows the back of Detective Bodnar sitting at the desk in the interview room

7  with Defendant Toliver sitting at the side of the desk, facing toward the camera.  Detective Bodnar was

8  positioned between Defendant and the interview room door.  It appears that only Detective Bodnar and

9  Defendant were present in the room during the interview. The tone of Detective Bodnar's voice during

10  the interview was, for the most part, moderate.  Detective Bodnar initially questioned Defendant about

11  personal background information, i.e., residence, age, date of birth, social security number, etc., and

12  about the circumstances of his recent arrest.  *Exhibit "F-1"*, pages 1-6.  Detective Bodnar's questions

13  thereafter primarily focused on two shooting incidents in which Defendant was allegedly involved.  The

14  first incident, in terms of questioning, involved a shooting that occurred near the University of Nevada

15  Las Vegas (UNLV), in which the occupants of the vehicle in which Defendant was riding exchanged

16  gunfire with the occupants of a vehicle bearing California license plates.  An individual who was riding

17  in the vehicle with Defendant, "Chuck", was shot in the leg when he exited the vehicle and exchanged

18  gunshots with the occupants of the other vehicle.  Defendant Toliver denied that he fired any shots

19  during that incident.  *Exhibit "F-1"*, pages 7-22.

20  Detective Bodnar then questioned Defendant Toliver at length regarding the shooting incident at

21  the Carey Arms Apartments in North Las Vegas, Nevada, which is the subject of the pending

22  Indictment, and about the events leading up to that incident.  *Exhibit "F-1"*, pages 7-43.  The interview

23  shows that Detective Bodnar sought to establish through specific questioning that Defendant Toliver

24  and his associates planned to ambush and shoot an opposing gang member at the Carey Arms

25  Apartments on September 13, 2004.  Defendant Bodnar also sought to establish that Defendant was one

26

27      [4]Although the North Las Vegas Police Department procedure manual, *Exhibit "G"*,
    recommends that any audio/video tape of a suspect's interview be transcribed for the subject's review
28  and signature, Detective Bodnar states that he did not do that in the case of Mr. Toliver.

1  of the persons who fired shots at a person during the incident and that Defendant Toliver used a certain

2  caliber firearm which apparently could be tied to shell casings or possibly bullets recovered from the

3  scene or the victim.

4      At certain points in the interview, Detective Bodnar challenged Defendant's answers to

5  questions regarding the shooting incidents.  In regard to the shooting incident near UNLV, Defendant

6  Toliver initially told the detective that he, "Chuck" and two other individuals had gone driving on the

7  Las Vegas Strip, and that Defendant then went back home.  *Exhibit "F-1"*, pages 7-8.  The following

8  exchange then occurred between Detective Bodnar and Defendant:

9      Q.    Okay.  Let's back up, because we've talked to some people, okay,
    including Chuck.  We talked to him that night at the hospital and

10      got a little bit more information than what you're telling as far as
    what happened. Okay?

11      A.    Yes sir.

12      Q.    So dude I need you to be straight with me and don't bull shit me.

13      A.    Oh no.  I'm not going to lie to you sir.

14      Q.    Okay.  And your story is way different from Chuck's, because

15      Chuck told us what happened and how he got shot.

16      A.    Yes sir.

17      Q.    Now you were with Chuck when he got shot.

18      A.    Yes sir.

19      Q.    So it's a little different than you were on the Strip and you ended

20      up at home.

21      A.    Yes sir.

22      Q.    Okay, so that's what I want to know.

23      A.    Oh, yes sir.

24  *Exhibit "F-1"*, pages 8-9.

25      Defendant proceeded to answer Detective Bodnar's questions regarding what occurred during

26  that incident.  *Exhibit "F-1"*, pages 9-22.

27      Detective Bodnar then questioned Defendant Toliver about a dispute or confrontation between

28  "Chuck" and a person from New Orleans named "Wodi" that led up to the shooting incident at the

8

1   Carey Arms Apartments.  *Exhibit "F-1"*, page 22, lines 643-644.  Defendant stated that he, "Chuck"

2   and others were in the area of the Carey Arms Apartments when the shooting occurred.  Defendant

3   initially indicated that he heard shots, but was not otherwise involved in the shooting.  *Id.,* page 28.

4   This led to the following exchange with Detective Bodnar:

5           Q.      Okay let me stop you because I don't want no more bull shit on
                    this okay?

6           A.      Yes sir.

7           Q.      Okay.  Here is the information that we have, okay, that you were
                    there.

8 (9)       A.      Yes sir.

10          Q.      Okay.  It wasn't that you were up here with your buddies.  We've
                    talked to everybody up here including your buddies, okay, that
11                  you were down here with when the shooting happened.  I'm not
                    saying you killed this guy.

12          A.      I understand.

13          Q.      But you were down there when this happened.  Okay?  Now, you
                    need to be straight with me and tell me who he was with when
14                  this happened.  Okay?  What happened that led up to you guys
                    going down there?

15 (16)     A.      We like, what do you mean like what happened?

17          Q.      Okay.  Something happened that caused you guys to go down
                    there.  Okay?  You guys went down there for whatever reason that
18                  ultimately ended up in a shooting.

19  *Exhibit "F-1"*, pages 29-30.

20          Detective Bodnar proceeded to question Defendant in depth about the incident, including

21  whether the ambush was planned, who was present when it was planned, the participants' respective

22  positions at the time of the ambush, what guns each participant had, who fired shots, and who may have

23  fired the shots which struck the victim.  At different points, Detective Bodnar informed Defendant of

24  information that the police had obtained in their investigation, which led to further questions.  In this

25  regard, Detective Bodnar asked Defendant who was present during the shooting.  Defendant responded

26  by identifying certain persons.  *Exhibit "F-1"*, pages 30-31.  This led to the following exchange:

27          Q.      Okay.  Well, okay, that's a little bit different information than what
                    we're being told of those who were down there.

28

1       A.     Yes sir.

2       Q.     Okay.  Who was down there.

3       A.     I just told you I was down there.

4       Q.     I know you were down there.  And how I know that is people say you were down there.

5

6       A.     Yes sir.

        Q.     Because people say that you were shooting down there.  They

7               don't say that you hit this guy.  And he's only killed by one gun and it wasn't yours.  So I know you didn't hit him.

8

9       A.     Yes sir.

        Q.     Because you can't shoot for shit and we know that from previous

10              things.

11       A.     Right.

12  *Exhibit "F-1"*, page 31.

13       Detective Bodnar then stated that the officers had spoken to other people who said they were

14  down there, which prompted Defendant to ask: "Who, um Little Donny?"  Detective Bodnar then asked

15  if Little Donny was there and Defendant responded yes.  Detective Bodnar then asked Defendant why

16  he was protecting Little Donny.  Defendant stated he was not protecting him.  *Id.,* page 31.  Detective

17  Bodnar then questioned Defendant in further detail about what occurred during the Carey Arms

18  shooting incident, including how many shots were fired by "Chuck" and how many shots were fired by

19  Defendant and whether they were shooting at the same person.  *Id.,* pages 31-41.

20       At about one hour into the interview, Detective Bodnar offered Defendant something to drink,

21  which Defendant declined.  *Id.*, page 41, lines 1225-1227.   After questioning Defendant about the paths

22  taken by the participants in leaving the area after the shooting and whether they met up afterwards,

23  Detective Bodnar then questioned Defendant about the guns he and others used during the shooting.

24  *Id.,* page 44.  Detective Bodnar asked Defendant if the gun he used during the Carey Arms shooting was

25  the same gun he had or used during the incident near UNLV when "Chuck" was shot.  Defendant

26  Bodnar explained to Defendant that police had recovered the shell casing from the guns that were fired

27  during the two incidents which were being tested at the laboratory and would allow the officers to

28  match the casings to the particular guns in the same manner as fingerprints.  *Id*   Detective Bodnar then

1   proceeded to question Defendant in detail regarding which guns he and the other participants had

2   during the shooting at Carey Arms.  *Id.*, pages 45-47.

3       Defendant stated that he and "Chuck" had used 9 mm guns during the incident.  Detective

4   Bodnar advised Defendant that there were not two 9 mm guns used at the location where he and Chuck

5   were, and again questioned him about the type of gun he had.  Defendant continued to state that he and

6   "Chuck" had 9 mm guns.  *Id.*, pages 51-52.  Detective Bodnar then questioned Defendant about other

7   matters relating to the shooting and then took a 9 minute break in the interview from 9:16 to 9:25 p.m.

8   *Id.* page 55.

9       Following the break, Detective Bodnar returned to what type of guns Defendant and "Chuck"

10  used in the incident.   Defendant again indicated that he and "Chuck" did not have a .22 caliber gun

11  ("deuce deuce") during the shooting.  *Id.*, 55-56.  This led to the following exchange:

12      Q.    Are you sure?  Tell me the truth dude.  I mean it's – we found the
              casings there right where you said you and Chuck were and that's
13            why I'm asking.  You know, I'm not saying anybody died as a
              result of a 22.  A 22 is a small bullet.  But there was a lot of
14            casings that were found there and that's why I'm asking.  It ain't a
              big deal who was having it.  I just need to know who was having
15            it.  Was it you or Chuck?

16      A.    Me sir.

17      Q.    Okay.  Why didn't you just tell me that in the beginning?

18      A.    Because I didn't want nothing to happen sir, to no one.

19      Q.    Like what do you mean?

20      A.    Like go down for anything.

21  *Exhibit "F-1"*, page 56.

22      Under further questioning, Defendant acknowledged that he had the 22 when he went down in

23  the alley and shot.  *Id.*, page 57.

24      After another break in the interview from 9:32 to 9:39 p.m., Detective Bodnar asked Defendant

25  Toliver whether a gun used in a third shooting incident would tie into a gun used in the shooting at

26  Carey Arms.  Defendant answered no.  *Id.*, page 59.  Detective Bodnar responded: "I mean now is the

27  time to clear up all this shit."  *Id.*  Defendant again responded no.   Near the conclusion of the interview,

28  Detective Bodnar asked Defendant about his involvement in robberies in which his name had "come

11

1  up" and again advised Defendant that now was the time to clear up those matters.  Defendant denied

2  involvement in other robberies mentioned by the detective.  *Id.*, pages 61-62.

3      The interview concluded with Detective Bodnar asking how to get in contact with Defendant.

4  Defendant provided his phone number and then asked Detective Bodnar for one of his cards.  *Id.* page

5  63.  Detective Bodnar turned off his tape recorder at 9:47 p.m.  The videotape, *Exhibit "F-3"*,

6  continued for a few more minutes.  After Detective Bodnar turned off the tape recorder, he asked

7  Defendant if there was anything else or anything he forgot.  Defendant responded no and appeared to

8  ask, "If I hear anything, I just call you?"

9      Detective Bodnar then told Defendant that some one would come get him and take him home.

10  Detective Bodnar left the interview room and shut the door.  Defendant remained seated in the

11  interview room several more minutes, until someone came and summoned him from the room.

12  Detectives Bodnar and Tanner testified that they believed Mr. Toliver had incriminated himself in the

13  shooting of the victim Gilbert Henry.  Despite this, Detective Bodnar and Detective Tanner testified

14  that they still allowed Mr. Toliver to leave at the conclusion of the interview and drove him home.

15      Detective Bodnar testified that he has given *Miranda* warnings hundreds of times and also

16  observed other officers provide *Miranda* warnings.  He is aware that if *Miranda* rights are not properly

17  given, statements made by a defendant can still be used in the investigation and may be used at trial to

18  impeach a defendant if he testifies.  Detective Bodnar testified that *Miranda* warnings are only required

19  if the suspect is in custody, but, out of habit, he sometimes gives the *Miranda* warnings to suspects who

20  are not in custody.  Detective Bodnar testified that it is his standard practice to recite the *Miranda*

21  warnings from memory.  He does not read them from a card or form.  Detective Bodnar was asked on

22  cross-examination to recite the *Miranda* warnings as he normally does.  In his general recitation of the

23  warnings, Detective Bodnar did not state that the person is entitled to consult with counsel prior to

24  questioning or to have an attorney present during questioning.

25      Detective Bodnar was cross-examined regarding the contents of North Las Vegas Police

26  Department Manual, *Defendant's Exhibit "G"*, including the provisions which discuss the purposes and

27  goals of interrogation and the manner in which interrogations should be conducted.  The manual

28  includes the statement that suspects should not be interviewed on their ground and should be placed in

1  unfamiliar surroundings to put the suspect into a submissive mood.  The procedure manual also

2  contains a summary of the *Miranda* warnings.  *Exhibit "G",* pages 11-25.  It states that the warnings do

3  not have to be exact so long as the warnings as a whole send a message to the defendant that he has a

4  right to have a lawyer appointed before questioning begins.  *Exhibit "G".*  The manual also

5  recommends using a *Miranda* card, which the suspect signs, and reads out loud to ensure that the

6  suspect can read and understand what he or she reads.  *Id.*  Detective Bodnar was also shown a North

7  Las Vegas "Rights of Adults Arrested" form, *Exhibit "H",* which lists the *Miranda* warning and has a

8  place for the person to indicate that he/she understands the rights and to sign the form.  Detective

9  Bodnar testified that rather than use such a form or card to read the *Miranda* warnings to Defendant, he

10 "chose to revert back to my training" and to recite the warnings from memory.  *Hearing Transcript*,

11 page 48.  He specifically referenced training he received sometime in the early or mid 1990's.  *Id.*

12       **2.**    **Defendant's January 15 and January 18, 2005 In-Custody Statements.**

13       Following the Defendant Toliver's indictment on December 14, 2004, Detective Bodnar

14 testified that Defendant Toliver was stopped by the police late on the evening of January 14, 2005,

15 following a shooting incident at the Texas Station Casino.  Detective Bodner went to the location where

16 Mr. Toliver was detained, arrested him and took him to the North Las Vegas Police Department.

17 Detective Bodnar testified that he and FBI agent Brett Shields began interviewing Mr. Toliver on

18 January 15, 2005 at approximately 12:30 a.m.  Detective Robert Tanner observed the interview from an

19 adjacent room.  Detective Bodnar testified that FBI agent Shields administered the *Miranda* warnings to

20 Defendant Toliver on January 15, 2005.  According to the transcript of the interview, Agent Shields

21 advised Defendant Toliver as follows:

22
23         Q.    Jonathan, what I'm going to do is I'm going to read you these rights here.  I'm just going to ask you to initial by each as I read them to you, okay?  Before I ask you any questions, you must understand your rights.

24
25            You have the right to remain silent; if you understand that, you can initial right there for me, please?  Thanks.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  And most importantly, if you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

26
27

28

13

1    Okay.  Can you read that?  That just tells me you can read and
     understand English, and then sign here.  Read it out loud for me.

2

3    A.    I have read this statement of my rights and I understand what my
           rights are.  At this time, I am willing to answer questions without
           a lawyer present.

4

5    *Exhibit "J".*

6         Defendant Toliver initialed and signed an Advice of Rights form.  *Exhibit "I".*  As set forth in

7    the testimony of Agent Shields, the form that was read to and signed by Mr. Toliver contained a blank

8    section which deleted information advising the person of his right to have counsel appointed for him if

9    he could not afford to hire an attorney.

10        Detective Bodnar testified that he and Agent Shields again interviewed Defendant Toliver on

11   January 18, 2005 while they were transporting him from the Stewart-Mohave Jail to Federal Court for

12   his initial appearance on the Indictment.  Detective Bodnar verbally informed Defendant Toliver of his

13   *Miranda* rights.  The interview was recorded and that portion of the interview in which the *Miranda*

14   rights were given is contained in *Exhibit "K".*  According to the transcript of the January 18, 2005

15   interview, Detective Bodnar advised the Defendant as follows:

16        MB:   Okay.  Today's date is January eighteenth, two thousand five.
                Time is approximately zero nine thirty.  Detective Michael
17              Bodnar, Robert Tanner, Agent Brett Shields, interviewing, eh,
                Jonathan Toliver, eh, reference case number zero four dash two
18              one seven three two.  Jonathan, you have the right to remain
                silent.  Anything you say can and will be used against you in a
19              court of law.  You got a right to an attorney.  If you can't afford an
                attorney, one'll be appointed to you free of charge  You understand
20              your rights?

21        JT:   Yes sir.

22        MB:   If you would speak up a little bit.

23        JT:   Yes.

24        MB:   Okay.  Do you wish to speak to us?

25        JT:   Yes.

26   *Exhibit "K".*

27        Detective Bodnar testified that Defendant again agreed to speak with the officers and made

28   incriminating statements.  Detective Tanner was also present during the interviews of Defendant

14

1   Toliver on January 15 and 18, 2005.  Detective Tanner testified that Defendant was very calm during

2   these interviews and voluntarily made statements after being advised of his *Miranda* rights.

3          **3.      Alleged Violations of Other Suspects' Miranda Rights.**

4          Defendant's counsel cross-examined Detective Bodner and FBI agent Shields regarding

5   statements obtained from other suspects in the Carey Arms Apartment shooting, including Co-

6   Defendant Donnie Bryant.  The Government objected to this line of questioning as irrelevant to the

7   subject motion to suppress.  Donnie Bryant was interviewed on September 14, 2004 by Detective

8   Bodner and FBI agent Shields.  At the beginning of that interview, Agent Shields advised Mr. Bryant of

9   his *Miranda* warnings pursuant to an FBI advice of rights form.  The agent had Mr. Bryant and his

10  mother, who was present, initial each warning on the form and also sign the form.  *Exhibit "M".*  The

11  transcript of the interview, as confirmed during questioning of Detective Bodnar, indicates that after

12  Mr. Bryant indicated he did not want to answer additional questions, the officers continued to question

13  him and obtained statements from him.  *Exhibit "L".*

14         A transcript and videotape of an interview of Jemar Matthews on October 12, 2004, *Exhibits*

15  *"N-1"* and *"N-2",* showed that Detective Bodnar advised Mr. Matthews that he had the right to remain

16  silent, that anything he said would be used against him in a court of law, that he had the right to an

17  attorney and if he could not afford one, an attorney would be appointed for him free of charge.

18  Detective Bodnar did not inform Mr. Matthews that he had the right to consult with an attorney prior to

19  questioning or have an attorney present during questioning.

20         On October 12, 2004, Detective Bodnar interviewed Edward Earl Walker, who was a suspect in

21  the Gilbert Henry shooting.  Mr. Walker was a juvenile and his father was present during the interview.

22  *Exhibit "O-1"* is the transcript of the interview.  Exhibit *"O-2"* is the recording of the interview.

23  Detective Bodnar informed Mr. Walker that he had the right to have an attorney or his parent present

24  during questioning, but did not inform him of his right to consult with an attorney prior to questioning.

25  The recording of the statement indicates again that Detective Bodnar recited the *Miranda* warnings very

26  rapidly.  Detective Bodnar acknowledged that he goes quickly through the recitation of rights as a

27  matter of habit.  *Hearing Transcript*, pages 89-90.

28  . . .

15

1     Detective Bodnar also interviewed Charles Richard on October 14, 2004.  *Exhibit "P-1"* is the

2  transcript.  *Exhibit "P-2"* is the video recording.  Detective Bodnar stated initially that "as a formality"

3  he advised Mr. Richard of his rights.  Although the transcript does not indicate that Detective Bodnar

4  stated that Mr. Richard had a right to have a parent present during questioning, the video recording

5  shows that Detective Bodnar, in fact, did state that Mr. Richard had the right to have a parent and/or

6  attorney present during questioning.  Detective Bodnar spoke rapidly and the transcriber presumably did

7  not pick-up the reference to "parent" on the recording.  A second interview of Charles Richard took

8  place on December 17, 2004.  *Exhibit "S-1"* is the transcript of the interview.  *Exhibit "S-2"* is the

9  video recording.   During this interview, Agent Shields advised Mr. Richard of his rights from an

10  advice of rights form.  The form used by Agent Shields did not advise Mr. Richard of his right to have

11  counsel appointed for him if he could not afford an attorney.  During this interview Agent Shields

12  informed Mr. Richard that he was looking at a potential death penalty.  Detective Bodnar testified that

13  he is aware that as a juvenile, Mr. Richard was not subject to the death penalty.

14     FBI agent Brett Shields testified that the form he used to advise Mr. Toliver of his *Miranda*

15  rights on January 15, 2005 had been altered by blocking out the portion of the form that advised the

16  person of his right to have counsel appointed for him if he could not afford to hire counsel.  Agent

17  Shields testified that he was not aware of this alteration at the time he interviewed Defendant Toliver,

18  and did not discover until several months later that another FBI special agent had altered the form as a

19  "practical joke."  Agent Shields testified that he unwittingly used this form approximately 10 times

20  from January to June 2005.  Agent Shields testified that he did not intentionally omit the information

21  from the form or intend not to advise the suspects of their right to have counsel appointed for them if

22  they could not afford to hire an attorney.

23     On cross-examination, Agent Shields was shown a transcript of an interview of Donnie Bryant

24  on September 4, 2002.  *Exhibit "T-3"*.  Agent Shields was present during that interview when Donnie

25  Bryant was advised of his rights by Detective Bodnar.  According to the transcript, Detective Bodnar

26  did not inform Mr. Bryant of his right to have counsel appointed for him if he could not afford one.

27  Detective Shields testified that this interview is what precipitated the other FBI special agent to play the

28  practical joke by blocking out the statement on the advice of rights form regarding the person's right to

1    have appointed counsel prior to questioning.  This "practical joke" was not further explained during the

2    hearing.

3         Agent Shields was also shown an advice of rights form for another interview of Donnie Bryant

4    that took place on September 14, 2004.  The advice of rights form used in this interview was not altered

5    and, therefore, contained the statement "If you cannot afford a lawyer, one will be appointed for you

6    before any questioning if you wish."  *Exhibit "M."*  Agent Shields was shown the advice of rights form

7    used during the interview of Defendant Toliver on January 15, 2005 and confirmed that this form

8    omitted the information and was the form Agent Shields used at that time as a result of the "practical

9    joke."

10        Agent Shields was also shown a transcript of an interview of Charles Richard on December 17,

11   2004.  *Exhibit "S-1".*  Agent Shields also confirmed that the advice of rights form used to advise Mr.

12   Richard of his rights omitted the information regarding the right to appointed counsel.  During this

13   interview, Agent Shields told Mr. Richard that he was potentially subject to the death penalty.  He

14   testified that he was unaware at the time of the interview that, as a juvenile, Mr. Richard was not

15   eligible for the death penalty if convicted.  Agent Shields testified that he was made aware of this

16   shortly after the interview and testified that he informed Mr. Richard and his mother that he was not

17   eligible for the death penalty.  Agent Shields was also shown an advice of rights form for another

18   individual interviewed on April 19, 2005 which also omitted the appointment of counsel information.

19   *Exhibit "R".*

20                                    **DISCUSSION**

21        Several issues are raised by Defendant's Motion to Suppress.  The first issue is whether

22   Defendant Toliver's statements on October 7, 2004 were made during a non-custodial, voluntary

23   interview.  Defendant contends that he was in custody on October 7, 2004 and that his statements

24   should be suppressed under the Fourth Amendment as "fruits of the poisonous tree."  *See Brown v.*

25   *Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York*, 442 U.S. 200, 99

26   S.Ct. 2248, 60 L.Ed.2d 824 (1979); and *Kaupp v. Texas*, 538 U.S. 626, 632-633, 123 S.Ct. 1843, 155

27   L.Ed.2d 814 (2003).  The second and third issues are whether statements obtained from Defendant on

28   October 7, 2004, and on January 15, 2005 and January 18, 2005, when Defendant was concededly in

17

1    custody, were obtained in violation of Defendant's *Miranda* rights and whether those statements should

2    be suppressed for all purposes at trial, including impeachment.

3         1.    **Whether Defendant Was In Custody At the Time of His Interview on October 7, 2004.**

4

5         For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer by

6    means of physical force or show of authority, in some way restrains the liberty of a citizen.  A seizure

7    occurs, if taking into account all the circumstances surrounding the encounter, the police would have

8    communicated to a reasonable person that he was not at liberty to ignore the police presence and go

9    about his business.  *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997), citing *Florida*

10   *v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991).  *See also Michigan v.*

11   *Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988).  The fact that the person

12   gives some form of consent to the officers does not render the encounter noncustodial if the

13   circumstances as a whole indicate that he was in custody.  *See Kaupp v. Texas, supra.*

14        A similar totality of the circumstances test is employed for determining whether a person is in

15   custody for purposes of determining whether he is entitled to *Miranda* warnings prior to questioning.

16   In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Court

17   defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person

18   has been taken into custody or otherwise deprived of his freedom of action in any significant way."  In

19   deciding whether the defendant was "in custody," two discrete inquiries are essential:  First, what were

20   the circumstances surrounding the interrogation, and second, given those circumstances, would a

21   reasonable person have felt at liberty to terminate the interview and leave.  *Thompson v. Keohane*, 516

22   U.S. 99, 113, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).  *Keohane* states:

23            Once the scene is set and the players' lines and action are reconstructed,
              the court must apply an objective test to resolve the "ultimate inquiry":
24            "[was] there a 'formal arrest or restraint on freedom of movement' of a
              degree associated with formal arrest."  *California v. Beheler*, 463 U.S.
25            1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) *(per curium)*
              (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714.)
26

27        There is no evidence that Defendant Toliver was formally arrested by Detectives Bodnar and

28   Tanner prior to or during the October 7, 2004 interview.  The issue is whether there was a restraint on

18

1   Defendant's freedom of movement of a degree associated with a formal arrest that supports a finding of

2   custody and a requirement for giving *Miranda* warnings.  The determination of custody depends on the

3   objective circumstances of the interrogation, not on the subjective views harbored by either the

4   interrogating officers or the person being questioned.  *Stansbury v. California*, 511 U.S. 318, 323, 114

5   S.Ct. 1526,1529, 128 L.Ed.2d 293 (1994).

6        In *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002), the court cited the following factors

7   as among those likely to be relevant in deciding whether the setting was such that a reasonable person

8   would believe that he or she was not free to leave:

9            "(1) the language used to summon the individual;  (2) the extent to which the
10           defendant is confronted with evidence of guilt;  (3) the physical surroundings of
             the interrogation;  (4) the duration of the detention;  and (5) the degree of
11           pressure applied to detain the individual."   *Hayden,* 260 F.3d at 1066 (citing
             *Beraun-Panez,* 812 F.2d at 580).   Other factors may also be pertinent to, and
12           even dispositive of, the ultimate determination of whether a reasonable person
             would have believed he could freely walk away from the interrogators;  the
13           *Beraun-Panez/Hayden* factors are simply ones that recur frequently.

14      The fact that questioning takes place in a police station or that the person voluntarily

15   accompanies the officers to the station to be questioned does not, by itself, convert the situation into a

16   custodial interrogation requiring the giving of *Miranda* warnings.  *Oregon v. Mathiason*, 429 U.S. 492,

17   97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d

18   1275 (1983); *Yarborough v.* Alvarado, 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  *See*

19   *also United States v. Crawford,* 372 F.3d 1048, 1059-1060 (9th Cir. 2004); *United States v.*

20   *Coutchavlis*, 260 F.3d 1149 (9th Cir. 2001) and *United States v. Norris*, 428 F.3d 907 (9th Cir. 2005).

21   Of course, if the person is taken into custody and transported to the police station for questioning, his

22   arrest must be supported by probable cause and he is entitled to be advised of his *Miranda* rights.

23   *Kaupp v. Texas, supra.*

24       In *Mathiason*, the defendant agreed to meet with the officer at the state patrol office.  Upon his

25   arrival, the officer took defendant to an office, advised him that he was not under arrest, told him that

26   he was suspected in a burglary and falsely stated that his fingerprints were found at the scene.  After

27   sitting silent for a few minutes, the defendant admitted that he had taken the property.  This occurred

28   within five minutes after the defendant arrived at the office.  The officer then provided *Miranda*

19

1   warnings, took a taped confession and Defendant was permitted to leave.  In holding that defendant was

2   not in custody, *Mathiason* states:

3            Such a noncustodial situation is not converted to one in which Miranda
             applies simply because a reviewing court concludes that, even in the

4            absence of any formal arrest or restraint on freedom of movement, the
             questioning took place in a "coercive environment."  Any interview of

5            one suspected of a crime by a police officer will have coercive aspects to
             it, simply by virtue of the fact that the police officer is part of a law

6            enforcement system which may ultimately cause the suspect to be charged
             with a crime.  But police officers are not required to administer Miranda

7            warnings to everyone whom they question.  Nor is the requirement of
             warnings to be imposed simply because the questioning takes place in the

8            station house, or because the questioned person is one whom the police
             suspect.  Miranda warnings are required only where there has been such a

9            restriction on a person's freedom as to render him "in custody."

10  *Mathiason*, 429 U.S. at 495.

11          In *Beheler*, defendant agreed to go with the police to the station house and answer questions

12  regarding a homicide.  Defendant was not handcuffed and was told that he was not under arrest.  At the

13  station house, the officers questioned defendant for less than 30 minutes, without advising him of his

14  *Miranda* rights.  Defendant was told that his statement would be evaluated by the district attorney and

15  defendant was permitted to go home.  The Court held that defendant was not in custody and declined to

16  distinguish *Mathiason* because the questioning occurred shortly after the crime occurred or because

17  defendant had been drinking and was emotionally distraught.  The Court also held that the fact that the

18  police had more information about defendant's involvement in the crime was not relevant to whether

19  defendant was in custody at the time of the questioning.

20          In *Yarborough v. Alvarado*, the Supreme Court overruled the Ninth Circuit's decision reversing

21  the state conviction of a 17 year old juvenile, based on the violation of *Miranda*.   The defendant was

22  suspected of involvement in a fatal shooting.  Approximately a month after the shooting, a police

23  detective left messages at defendant's house and with his mother advising that the detective wished to

24  speak with the defendant.  The defendant's parents brought him to the police station to be interviewed.

25  Defendant was taken to a small interview room, while his parents remained in the lobby.  Defendant

26  was questioned for two hours during which he was not advised of his *Miranda* rights or told that he was

27  free to leave.  At the end of the interview, however, defendant was allowed to go home with his parents.

28  The federal courts' review was based on whether the state court's decision that defendant was not in

20

1   custody was reasonable under clearly established law.  The Ninth Circuit held that the state court should

2   have found that the defendant was in custody because of his youth and inexperience with law

3   enforcement.  In reinstating the conviction, the Supreme Court held that defendant's youth and

4   inexperience with law enforcement were subjective factors that had no application under the objective

5   criteria used to determine custody under *Miranda*.

6        The Supreme Court held that the objective factors supported a decision by reasonable jurists on

7   either side of the custody issue.  Certain facts weighed against finding that the defendant was in

8   custody.  The police did not transport him to the station or require him to appear at a certain time.  They

9   did not threaten him or suggest he would be placed under arrest.  His parents remained in the lobby,

10  which suggested that the interview would be brief.  The focus of the interview was on the other

11  suspect's involvement in the crime.  The officers appealed to defendant's interest in telling the truth and

12  helping the police.  During the interview, the officers asked defendant if he wanted to take a break.  At

13  the end of the interview, defendant went home.  The Court held that "[a]ll of these objective

14  circumstances are consistent with an interrogation environment in which a reasonable person would

15  have felt free to terminate the interview and leave." *Yarborough*, 541 U.S. at 664-65.  The Court noted,

16  however, that other facts weighed in favor of finding custody.  The interview lasted two hours.

17  Defendant was not told he was free to leave.  Defendant was brought to the station by his legal

18  guardians and was possibly aware that the police rebuffed his parents' request to be present during the

19  interview. *Yarborough*, 541 U.S. at 665.  Because the state court's decision that defendant was not in

20  custody was reasonable under the established objective criteria, the Court reinstated his conviction.

21        In *United States v. Crawford,* 372 F.3d 1048, 1059-1060 (9th Cir. 2004), an FBI agent and four

22  police officers went to defendant's residence, ostensibly to conduct a parole search.  Two officers

23  entered defendant's bedroom with guns drawn and told defendant that they were conducting a parole

24  search.  While defendant was detained during the search, the FBI agent asked him about "an old bank

25  robbery case."   Defendant was not forthcoming and the agent attributed this reticence to the presence of

26  the four state officers.  When the search ended, the agent asked defendant whether he would prefer to

27  speak in "a private place" with just the agent and a police detective.  Defendant agreed and

28  accompanied the agent and detective in the agent's vehicle to the local FBI office.  Defendant was

1   placed in an interview room with the agent and the detective.   The agent told defendant that he was not

2   in custody and could leave at any time.  However, "to make it as clean as possible," the agent attempted

3   to give defendant the *Miranda* warnings.  Defendant stopped the agent, protesting that the warnings

4   made him nervous and that he thought he was present merely to discuss an old case.  Both the agent and

5   the officer reassured defendant that he was not under arrest and that he was free to leave.   No further

6   attempt was made to read the *Miranda* warnings.

7         In holding that defendant was not in custody, the court in *Crawford* held  "that detention ended

8   when Defendant agreed to go to the FBI office."   In holding that defendant was not in custody during

9   the interrogation at the FBI office, the court noted that the agent told the defendant he was not under

10   arrest and reassured him after the attempted *Miranda* warnings that he was not under arrest.  The

11   officers also took defendant home after the interview.  In affirming the denial of the motion to suppress,

12   *Crawford* states:

13         Being aware of the freedom to depart, and in fact departing after
          questioning at a law enforcement office, suggests that the questioning was
14         noncustodial.  *See United States v. LeBrun,* 363 F.3d 715, 722 (8th
          Cir.2004) (en banc) (concluding "that the defendant was not in custody
15         because, among other things, the officers told him that he was free to
          leave and that he would not be arrested and because he was in fact not
16         arrested at the conclusion of the interview").

17   *Crawford,* 372 F.3d at 1060.

18         In *United States v. Norris*, 428 F.3d 907 (9th Cir. 2005), an FBI agent and a police officer went

19   to defendant's residence to question him about the sexual abuse of a child.  Defendant stated that he had

20   no problem talking to the officers.  Because it was a cold day and defendant had no electricity, the

21   officers suggested that they continue the interview at the police substation.  The officers made clear to

22   defendant that his cooperation was voluntary and offered to give him a ride to the substation and told

23   him they would give him a ride back home after the interview.  On the way to the police station,

24   defendant sat in the front seat unrestrained.  Upon arrival at the substation, the officers reiterated that

25   his cooperation was strictly voluntary and that whenever he wanted to terminate the interview, they

26   would take him home.  Defendant was interviewed in a living room type setting of the substation.  At

27   no time during the interview was defendant restrained in any way.  Neither officer was in uniform and

28   neither displayed a firearm at any time.  The principal factual dispute regarding whether the Defendant

22

1   was in custody was the conflicting testimony of whether the officers threatened a polygraph.  In holding

2   that the interrogation was not custodial, the court distinguished *United States v. Lee*, 699 F.2d 466 (9th

3   Cir. 1982) which was relied on by defendant:

4               This case differs significantly from *Lee*. In *Lee*, the defendant was
                questioned in a closed FBI car with two officers for well over an hour
5               while other investigators were in and around his house.  *See Lee*, 699
                F.2d at 467-68.  After the two officers allowed Lee to repeat his
6               exculpatory tale, they confronted him at length with factual evidence
                contradicting his story, and told him that "now's the time to tell us the
7               truth." *Id.* at 467.

8                Unlike the officers in *Lee*, Agent Mireles and Detective Hangartner did
                not attempt to challenge Norris's statements with other "known facts"
9               suggesting his guilt, *Id.*;  they merely asked Norris about the allegations.
                Norris responded by voluntarily confessing to his involvement in the
10              November 25, 2000 incident that the officers were investigating, and
                proceeded to tell the officers about other incidents that occurred in the
11              summer of 2000, about which Norris had not even been asked.

12

13  *Norris*, 428 F.3d at 913.

14        The court also stated that the "asserted threat of a polygraph would be more relevant to whether

15  Norris's confession was voluntary, rather than whether he was in custody."  *Id.,* citing *Oregon v.*

16  *Mathiason,* 429 U.S. 492, 495-96, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

17        In both *Crawford* and *Norris*, the court found it persuasive that the defendants were advised that

18  they were not under arrest and could terminate the interview at any time and were permitted to go home

19  after the interview.  *Crawford* and *Norris* do not adopt the Eighth Circuit's view in *United States v.*

20  *LeBrun,* 363 F.3d 715, 722 (8th Cir.2004) (en banc) that the coercive aspects of the interview room or

21  the manner in which the questioning is conducted are "largely irrelevant" to the custody determination.

22  *Norris* distinguished *Lee*, in part, based on the fact that the agents did not challenge defendant's

23  statement with other facts suggesting his guilt or by demanding that defendant tell the truth, thus, at

24  least indicating that these factors remain relevant to the custody determination.

25        In this case, the detectives' initial contact with Defendant Toliver took place at the jail while he

26  was in the process of being released on a misdemeanor charge unrelated to the crime that the detectives

27  were investigating.  This is certainly a factor in the totality of the circumstances.  As *Crawford*

28  indicates, however, the fact that defendant was detained or in custody before he agreed to go with the

1   officers does not require a conclusion that his decision to go with them was not voluntary.  In order for

2   such consents to be voluntary, however, it is probably necessary that the defendant first be advised that

3   the detention is ended and that he is free to leave before he is asked to consent to further questioning or

4   to a search.[5]  Although the detectives' conversation with Defendant at the jail was not recorded, both

5   detective testified consistently that they asked Defendant Toliver if he would be willing to go with them

6   to the police department and talk to them about some shootings.  They told Defendant that he was not

7   under arrest and would not be arrested, and that he would be taken home after the interview.  No

8   testimony was provided at the hearing to contradict the detectives' description of their conversation

9   with Defendant.  The evidence also shows that at the end of the interview Defendant Toliver asked for

10  Detective Bodnar's card and asked whether he should call Detective Bodnar if he heard something.  The

11  evidence is also undisputed that Defendant was then taken home.  This evidence tends to support the

12  detectives' testimony that Defendant agreed to go with them and was told that he would not be arrested.

13  *See Yarborough* and *Crawford, supra.*

14      Defendant argues that a consent obtained under these circumstances cannot reasonably be

15  viewed as voluntary because Defendant was given no real choice to going with the officers and his only

16  other choice was to remain in custody for an indeterminate period of time.  Defendant argues that "[i]t

17  is inherently coercive for law enforcement officials to tell a person that his options are 'either talk to us

18  and then go home or stay in jail.'"  *Defendant's Supplement to Motion to Suppress (#137),* page 15.

19  The cases relied on by Defendant involved circumstances in which the officers told the suspects that

20  they would be arrested, or detained, until a search warrant could be obtained, if they did not consent to a

21  search or agree to answer questions.  *See United States v. Ocheltree*, 622 F.2d 992 (9th Cir. 1980);

22  *United States v. Stephens*, 206 F. 3d 914, 917 (9th Cir. 2000); *United States v. Syslo*, 303 F.3d 860 (8th

23  Cir. 2002); *Williams v. Withrow*, 944 F.2d 284 (6th Cir. 1991); *United States v. Diacomo*, 579 F.2d

24

25  _____

26      [5]*See also United States v. Cota*, 953 F.2d 753 (2d Cir. 1992), in which the defendant's vehicle
    was stopped by the police and she was handcuffed during the officer's initial investigative detention.

27  The defendant was then released from handcuffs, advised that she was not under arrest and was asked to
    go to the police department to answer questions.  The court held that defendant's decision to go with the

28  officers was voluntary and the subsequent interview was noncustodial.

1  1211, 1214 (10th Cir. 1978).

2  In *United States v. Syslo*, the Eighth Circuit affirmed the district court's decision that defendant

3  was not in custody when she initially agreed to go to the police station and answer questions and that

4  the first part of her statement to the police was therefore admissible. The district court suppressed the

5  second part of defendant's statement made after the officer told her that she was sitting on the line

6  between going to jail or walking out of the police station with her children. Because the district court

7  suppressed this part of defendant's statements and defendant was still convicted, the Eighth Circuit was

8  not required to decide whether this part of the order was correct.

9  In *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991), two police officers went to

10  defendant's house to question him about a homicide. The officers searched defendant but did not

11  handcuff him. They then asked defendant to accompany them to the police station. At the station,

12  defendant answered questions denying his involvement in the crime, at which point the officer told him

13  that if he did not tell them the truth, they would arrest him and formally charge him. In finding that

14  defendant was in custody, the court stated:

15         Two police officers came to Williams' house, searched him, put him in
       an unmarked police car and transported him to the police station. The
16         officers repeatedly conveyed to Williams the seriousness of his situation,
       and threatened him with arrest. Williams was given the choice of
17         cooperating with the police or going to jail. The district judge, who
       listened to an audio tape of the interrogation, found the officers' tone to
18         be "severe and accusatory." Clearly, a reasonable person would not feel
       free to leave; therefore Williams was in custody.

19

20  In *United States v. Diacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978), the court found that

21  defendant was threatened with arrest unless he agreed to "voluntarily" appear at the Secret Service

22  Office the next day to answer questions. In finding that defendant was in custody, the court cited the

23  following circumstances:

24         Defendant was kept apart from his companion. He was confronted
       simultaneously by four federal agents. He was told he was suspected of
25         passing counterfeit money. He was given only partial Miranda warnings.
       He was told he had to surrender any counterfeit money he possessed. He
26         was told he could be arrested and jailed that evening. He was told he
       could choose between immediate arrest and "voluntary" appearance at the
27         Secret Service Office the following morning.

28  . . .

1    There is no evidence that Detectives Bodnar or Tanner made similar threats to Defendant

2 Toliver in order to obtain his agreement to accompany them to the police department.  The detectives,

3 at most, presented Defendant with a more convenient option of going with them and later receiving a

4 ride home or to wherever he wanted to go, instead of remaining in jail a few more hours until he was

5 released.  Contrary to Defendant's assertion, he was not presented with the alternative of being jailed

6 for an indeterminate period of time.  No evidence was presented, for example, that the detectives told

7 Defendant that if he refused to go with them, he would be arrested or that he would not be released

8 from the jail that evening as scheduled.

9    There was some variance between Detective Bodnar's and Detective Tanner's testimony

10 regarding the sequence of events after the detectives arrived at the jail.  Detective Bodnar testified that

11 upon arriving in the jail, he and Detective Tanner first contacted Defendant Toliver to see if he would

12 be willing to go with the officers before Detective Bodnar arranged with the jail to have Defendant

13 released to them.  *Hearing Transcript*, pages 13-14.  Detective Tanner indicated, however, that while

14 the detectives were waiting for Defendant to be brought out to talk to them, Detective Bodnar signed

15 the jail paperwork for the release of Defendant's property.  *Hearing Transcript*, page 104.  This

16 variance would be significant if Defendant Toliver knew that the officers had already obtained custody

17 over him before he was asked if he would be willing to go to the police department and answer

18 questions.  Such a circumstance would tend to support a finding that a reasonable person would not

19 believe he was free to reject the officers' invitation to go them.  Assuming that Detective Tanner's

20 recollection is correct, however, no evidence has been presented that Defendant was informed that

21 Detective Bodnar had already signed for his release before the detectives spoke with him.  Given the

22 lack of such evidence, the Court does not give this variance in the detectives' testimony much weight.

23    Defendant also argues that upon entering the interview room at the North Las Vegas Police

24 Department, Detective Bodnar made sure that Defendant's bag of personal belongings was left outside

25 the interview room so that it would not distract Defendant during the questioning.  *Hearing Transcript,*

26 page 57.  Defendant argues that this is a further indicia that Defendant was in custody.  An officer's

27 possession of defendant's identification papers or other property, together with other circumstances, at

28 the time he requests "consent" is a significant factor where such possession is part of the means by

1  which the officer exerts custody over the person.  *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319,

2  75 L.Ed.2d 229 (1983) (officers' possession of defendant's identification, airplane ticket and luggage at

3  an airport would indicate to a reasonable person that he was not free to disregard the officer's questions

4  and their request to search his luggage.)  *See also United States v. Chan-Jimenez*, 125 F.3d 1324, 1327-

5  28 (1997) (during roadside stop, officer kept his hand on his holstered gun and took possession of

6  defendant's driver's license and registration, without returning them to defendant before requesting his

7  consent to search the vehicle.  The officer also did not advise defendant prior to obtaining the consent to

8  search that he was free to leave and did not read him the *Miranda* warnings); *United States v. Kennedy*,

9  573 F.2d 657 (9th Cir. 1978) (two FBI cars and four agents stopped defendant's vehicle and one agent

10  questioned him for 45 minutes in an FBI vehicle, with a second agent present in the vehicle.  Another

11  agent sat in defendant's vehicle.  The agents did not tell defendant he was free to leave if he chose.)

12      Here, Detective Tanner's testimony indicates that Defendant was in possession of his bag of

13  belongings when he and the detectives left the jail.  *Hearing Transcript*, page 113.  Upon entering the

14  interview room at the police department, Detective Bodnar, by some unspecified means, made sure that

15  the bag of belongings were left outside the room.  Defendant was inside the North Las Vegas Police

16  Department and the officers could have prevented him from leaving, if they chose to do so.  As

17  Defendant has correctly pointed out, in order to exit the building, Defendant would have needed to be

18  escorted out through secured areas and doors.  *Mathiason*, *Beheler*, and *Yarborough*, as well as

19  *Crawford* and *Norris,* however, all indicate that the "coercive environment" of a police station or office

20  is not enough, standing alone, to convert an otherwise voluntary interview into custodial interrogation.

21  From the time he left the Stewart-Mohave Jail, through the completion of the interview, Defendant was

22  not in handcuffs, the officers did not display their weapons to him and during the interview only he and

23  Detective Bodnar were in the room.  The fact that Defendant's belongings were left outside the

24  interview room did not materially enhance the "coercive environment" of questioning in the police

25  department.

26      What distinguishes this case from *Crawford* and *Norris* is that once Defendant was inside the

27  interview room, Detective Bodnar did not again advise or remind Defendant Toliver that he was not

28  under arrest or that he was free to leave at any time.  Instead, upon beginning the interview,  Detective

27

1   Bodnar quickly recited the *Miranda* warnings to Defendant.  The Seventh, Tenth and Eleventh Circuits

2   have stated that the giving of *Miranda* warnings does not convert an otherwise noncustodial

3   interrogation into a custodial one, but in some circumstances the giving of the warnings may support a

4   finding that the defendant was in custody.  *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir. 1996); *United*

5   *States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir. 1998); *Tukes v. Dugger*, 911 F.2d 508, 516 n.11

6   (11th Cir. 1990).  In this regard, *Sprosty v. Buchler* states:

7               As the district judge also noted, to hold that by Mirandizing a suspect the
                police may create a custodial setting where one would not otherwise exist
8               would result in discouraging the desirable practice of giving *Miranda*
                warnings at the earliest point where a police-citizen encounter progresses
9               beyond an investigatory stop.  *Cf. Berkemer,* 468 U.S. at 430-32, 437-40,
                104 S.Ct. at 3145-46, 3148-50 (bright-line rule that *Miranda* warnings be
10              given as soon as suspect is in custody).  Yet in the context of a prolonged
                detention where there is persistent, accusatory questioning by several
11              officers, the fact that the police observed certain formalities of a custodial
                arrest without actually telling Sprosty that he was not under arrest does
12              provide some support for an inference that Sprosty was in custody for
                purposes of *Miranda.*

13

14      After advising Defendant of his *Miranda* rights, Detective Bodnar proceeded to question

15  Defendant for one and a half hours before taking a break at 9:16 p.m.  The Court further notes that

16  Detective Bodnar decided when to take breaks and did not ask Defendant if he wanted a break.  While

17  Detective Bodnar did not directly accuse Defendant of murder or explicitly seek a confession, his

18  questioning focused on the factual circumstances of Defendant's participation in planning the ambush,

19  his specific location during the ambush, the number of shots he fired, whom he fired at and the type of

20  firearm he used during the incident.  When Defendant Toliver gave answers negating his involvement

21  in the shooting incidents, Detective Bodnar confronted him with factual evidence or information

22  contradicting his story.  Detective Bodnar told Defendant not to "bullshit" him and to be straight and

23  tell the truth.  These statements can fairly be described as being made in a forceful or determined tone

24  of voice.  Detective Bodnar, however, did not yell at Defendant.  Nor did he couple his statements with

25  any type of explicit threat of arrest or prosecution.

26      The circumstances here did not involve a relatively brief interview in which the Defendant was

27  informed of the officer's suspicions or the evidence of his involvement, in response to which Defendant

28  readily made admissions or a confession.  *See Mathiason, Beheler,* and *Norris supra.*  Rather, it was

28

1    akin to the confrontational questioning that courts have found support a finding of custody.  *See United*

2    *States v. Lee*, 699 F.2d 466 (9th Cir. 1982); *Unites States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993)

3    Unlike *Yarborough*, the *focus* of the interview was not on the other suspect's involvement in the crime.

4    Rather, Detective Bodnar sought to establish Defendant's involvement in crimes, as well as that of the

5    other participants.  These circumstances, therefore, weigh in favor of a finding that Defendant was in

6    custody.

7         This case presents a much closer question on custody than the circumstances in *Crawford* or

8    *Norris.*  Like *Yarborough v. Alvarado,* there are factors that weigh both in favor and against a finding

9    that Defendant was in custody.  Although Defendant was in the custody of the city jail when the

10   detectives initially met with him, the evidence supports the conclusion that Defendant voluntarily

11   agreed to go with them to the police department to answer questions.  Defendant was advised that he

12   was not under arrest and would not be arrested and that he would be given a ride home or to wherever

13   he wanted after the interview.  Upon leaving the jail and through completion of the interview at the

14   police department, Defendant was not handcuffed.  If Detective Bodnar had again informed Defendant

15   during the interview that he was not under arrest or that he could stop the interview and go home at any

16   time, the Court would readily conclude that Defendant was not in custody during the interview.  *See*

17   *Crawford* and *Norris, supra.*  As it is, the failure to again provide such information after Defendant was

18   read his *Miranda* rights and the prolonged and, at times, confrontational questioning of Defendant tend

19   to support a finding that a reasonable person in Defendant's position would have believed he was not

20   free to leave until he had given answers satisfactory to Detective Bodnar.  Defendant did not, however,

21   indicate at any time that he no longer wanted to answer questions or request that the interview end.  At

22   the end of the interview, Defendant asked Detective Bodnar for his business card and asked if he should

23   call the Detective if he heard something.  Defendant was then taken home.  These latter factors,

24   combined with Defendant's agreement to be interviewed, ultimately weigh in favor of a finding that

25   Defendant was not in custody.

26        Therefore, based on the totality of the circumstances, the Court finds that Defendant Toliver was

27   not in custody on October 7, 2004.  Defendant's rights under the Fourth Amendment were not violated

28   because he was not under arrest or in custody on October 7, 2004 and the detectives were not required

1  to advise him of his *Miranda* rights.

2          **2.**      **Whether Defendant Was Properly Advised Of His *Miranda* Rights**
3                    **During the October 7, 2004 Interview and During the Interview On January 18, 2005.**

4        The Court has determined that Defendant Toliver was not in custody on October 7, 2004.

5  Therefore, whether Detective Bodnar complied with the requirements of *Miranda* at the time of that

6  interview is not necessary to the Court's decision on this motion.  Although the Government argues that

7  Detective Bodnar complied with *Miranda* at the beginning of the interview, if Defendant was in

8  custody, suppression of his statement would probably be required because the Government produced no

9  evidence that probable cause existed to arrest Defendant on October 7, 2004 or that the taint between

10  his arrest was purged prior to the giving of his statement.  *See Kaupp v. Texas, supra.*

11        The Government acknowledges that the advice of rights given to Defendant by Agent Shields on

12  January 15, 2005 after Defendant was arrested violated *Miranda* because Defendant was not informed

13  of his right to have counsel appointed for him if he could not afford to hire counsel.  The Government

14  concedes that Defendant's January 15, 2005 statement may not be admitted against him in the

15  Government's case-in-chief.

16        On January 18, 2005, Detective Bodnar also advised Defendant Toliver of his *Miranda* rights

17  while he was being driven from jail to make his initial appearance in Federal Court.  Detective Bodnar's

18  recitation of the *Miranda* warnings on October 7, 2004 and January 18, 2005 were the same.

19        On October 7, 2004, Detective Bodnar advised Defendant Toliver of his rights as follows:

20              [Y]ou've got the right to remain silent.  Anything you say can and will be
21              used against you in a court of law.  You've got a right to an attorney.  If you can't afford an attorney one will be appointed to you free of charge.

22        On January 18, 2005, Detective Bodnar advised Defendant as follows:

23              Jonathan, you have the right to remain silent. Anything you say can and
24              will be used against you in a court of law.  You got a right to an attorney. If you can't afford an attorney, one'll be appointed to you free of charge.
25              You understand your rights?

26        Detective Bodnar did not expressly inform Defendant that he had the right to consult with an

27  attorney prior to questioning or to have an attorney present during questioning.  Defendant argues that

28  the warnings given to Defendant on both dates were not adequate under the Ninth Circuit's

1   interpretation of *Miranda* in *United States v. Noti,* 731 F.2d 610 (9th Cir. 1984).

2         In *Noti*, the defendant was informed of his "right to the services of an attorney before

3 questioning," but was not told that he had the right to the presence of an attorney during questioning.

4 The court noted that there was a division between the Second and Fifth Circuits whether an officer must

5 explicitly inform a defendant of the right to the presence of counsel during questioning.  The Second

6 Circuit deemed the omission of this warning insignificant, holding that *Miranda* is satisfied by the

7 inference that can be drawn from the combination of statements that defendant has the right to remain

8 silent and that he has the right to consult with counsel.  *See United States v. Lamia*, 429 F.2d 373, 377

9 (2d Cir.), *cert. denied* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970).  *Noti*, however, agreed with

10 the position of the Fifth Circuit in *Windsor v. United States*, 389 F.2d 530, 533 (5th Cir. 1968), that the

11 defendant must be informed of his right to the presence of counsel during questioning.  The court stated

12 that *Miranda*, itself, suggests that the right to have an attorney present during questioning is significant

13 and independent of the right to counsel before questioning. The court emphasized the importance of

14 having counsel present during questioning and, therefore, the importance of informing defendant of this

15 right.  731 F.2d at 614-15.  *Noti* was followed by the court in *United States v. Bland*, 908 F.2d 471 (9th

16 Cir. 1990), where the officer again informed the defendant of his right to counsel prior to questioning,

17 but did not inform him of his right to have counsel present during questioning.  In *Territory of Guam*,

18 758 F.2d 1341 (9th Cir. 1985), the court also cited the requirement of *Noti* that a defendant be informed

19 both of the right to counsel prior to and during questioning.  The court held that the advice of rights

20 form read to defendant, although ambiguous, met the minimum standard of informing defendant of both

21 rights.

22         In *Sweeney v. United States*, 408 F.2d 121 (9th Cir. 1969), the officer gave *Miranda* warnings

23 substantially similar to those given by Detective Bodnar.  Defendant did not move to suppress his

24 statements based on violation of his *Miranda* rights and did not object to the officer's testimony at trial

25 regarding his statements.  The court therefore reviewed the admission of the statement under a plain

26 error standard.  The court indicated that although the right to consult with counsel prior to and during

27 questioning might be inferred, the warnings may not have been sufficient to comply with the

28 requirements of *Miranda*.  The court stated, however, that if defendant had moved to suppress or had

objected to the statement, the officers might have been able to demonstrate that adequate *Miranda*

warnings were given.  On this basis, the court affirmed defendant's conviction.  *Sweeney* did not

indicate, however, that the court would have upheld the warnings if they had been properly challenged

by defendant.  Although *Sweeney* was cited by the dissent in *Noti*, it was not referenced in the majority

opinion.  As this Court reads *Noti*, defendant must be informed of both his right to consult with counsel

prior to questioning and to have counsel present during questioning.[6]

In *California v. Prysock*, 453 U.S. 355, 360, 101 S.Ct. 2806, 2809, 69 L.Ed.2d 696 (1981), the

Supreme Court stated that there is no precise formulation or required talismanic incantation for

providing the *Miranda* warnings so long as the effective equivalent of the warnings are provided.  In

*Prysock,* defendant was informed of his rights, including the right to consult with counsel prior to

questioning and to have a lawyer present during questioning.  The officer also advised Defendant that

he also had the right to have counsel appointed to represent him at no charge, but did not specifically

tell the defendant that counsel would be appointed before any questioning.  In holding that the warnings

were sufficient, the Court noted that there was nothing in the warnings which suggested any limitation

on the right to the presence of appointed counsel different from the right to counsel in general and the

right to appointment of counsel was not tied to the occurrence of some future event.

Similarly, in *Duckworth v. Eagan*, 492 U.S.195, 109 S.Ct. 3875, 106 L.Ed.2d 166 (1989), the

Court reiterated that no precise form or order of the warnings are required so long as they are effectively

provided.  The Court further stated:

> We think the initial warnings given to respondent touched all the bases
> required by *Miranda*.  The police told respondent that he had the right to
> remain silent, that anything he said could be used against him in court,
> that he had the right to speak with an attorney before and during
> questioning, that he had "this right to the advice and presence of a lawyer
> even if he could not afford one," and that he had the "right to stop
> answering at anytime until he talked to a lawyer."

[6]*United States v. Caldwell,* 954 F.2d 496 (8th Cir. 1992), involved a warning and circumstances
similar to *Sweeney*.  *Caldwell* discussed the split of circuit opinions on the requirement that the
defendant be explicitly advised of his right to the presence of counsel.  *Caldwell* appears to side with
those decisions holding that expressly advising the defendant of his right to the presence of counsel is
not a prerequisite to the giving of valid *Miranda* warnings.  In any event, the court found that under the
plain error standard, the warnings given to defendant did not justify the reversal of his conviction.

1    The officer also advised defendant that "we have no way of giving you a lawyer, but one will be

2  appointed for if you wish, and when you go to court."  The Court held that this statement did not violate

3  *Miranda* and simply provided additional information to defendant regarding his right to appointed

4  counsel.

5    Although *Miranda* may be violated by providing the warnings in a misleading fashion, this

6  Court does not read *Prysock* or *Duckworth* as holding that it cannot also be violated by omitting

7  provisions of the warnings.  Moreover, in *Noti*, the Ninth Circuit discussed *Prysock*, but did not read

8  that decision as justifying the failure to inform defendant of his right to have counsel present during

9  questioning.  Nor does *Noti* indicate that the court's basis for finding the warnings inadequate was that

10  they were misleading versus simply failing to advise the defendant of an important requirement of the

11  warnings.  The Court is bound by the decision in *Noti* and therefore finds that *Miranda* is not satisfied

12  by simply advising the defendant that he has the right to counsel, without also advising him that he has

13  the right to consult with counsel prior to questioning or to have counsel present during questioning.

14  The Court, therefore, finds that the *Miranda* warnings provided to Defendant Toliver by Detective

15  Bodnar on January 18, 2005 did not comply with the requirements of *Miranda* and requires suppression

16  of Defendant's statement in the Government's case-in-chief.

17    In its Response to Defendant's Motion to Suppress (#50), the Government argued that Detective

18  Bodnar's advice of warnings on October 7, 2004 complied with the requirements of *Miranda*, but

19  conceded that Defendant's January 15, 2005 and January 18, 2005 statements were inadmissible in the

20  Government's case-in-chief based on the violation of Defendant's *Miranda* rights.  The Government

21  apparently incorrectly assumed that the advice for rights on January 18, 2005 was provided by Agent

22  Shields pursuant to the altered advice of rights form.  The Government was obviously careless in its

23  examination of the facts of this case.  It makes no sense, however, that the Government would argue

24  that Detective Bodnar complied with *Miranda* on October 7, 2004, but concede that the identical

25  warning he gave on January 18, 2005 violated *Miranda.*

26    Based on the Court's finding that both advice of rights did not comply with the requirements of

27  *Miranda*, the Government's mistaken concession regarding the January 18, 2005 statement is moot.

28  Were the Court required to decide whether the Government is bound by its concession, however, the

1   Court would allow the Government to withdraw it, since it was based on a clear mistake of fact and

2   Defendant would not be unfairly prejudiced by a determination of whether the warnings actually given

3   by Detective Bodnar on January 18, 2005 complied with *Miranda.*

### 3.   Whether The Government Should Be Precluded From Using Statements Obtained In Violation of *Miranda* For Impeachment Purposes.

6       A violation of *Miranda* bars the Government from introducing a defendant's otherwise

7   voluntary statement in its case-in-chief but does not preclude the Government from using defendant's

8   statement for impeachment purposes if he testifies.  *Harris v. New York,* 401 U.S. 22, 91 S.Ct. 643, 28

9   L.Ed.2d 1 (1968); *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 22 (1985); *United States*

10  *v. Patane*, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed. 2d 667 (2004).  An involuntary statement obtained

11  from defendant in violation of the Fifth Amendment, however, may not be admitted for any purpose.

12  *Pollard v. Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002), citing *Michigan v. Harvey*, 494 U.S. 344, 351,

13  110 S.Ct. 1176, 108 L.Ed2d 293 (1990) and *Henry v. Kernan*, 197 F.3d 1021, 1029 (9th Cir. 1999).

14      Defendant does not argue that his October 7, 2004, January 15, 2005 and January 18, 2005

15  statements were coerced and therefore involuntary under the Fifth Amendment.  Nor does the evidence

16  support a conclusion that Defendant was subjected to coercion which would render his statements

17  involuntary.  *See United States v. Crawford*, 372 F.3d at 1060-61 (9th Cir. 2004).  Defendant argues,

18  however, that because the police and FBI agents engaged in an intentional practice of violating the

19  suspects' *Miranda* rights during the subject investigation for the purpose of obtaining impeachment

20  evidence and to deter the suspects from testifying, Defendant's statements should be suppressed for all

21  purposes.  In support of this argument, Defendant relies on *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir.

22  (1992); *California Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039 (1999); and *Henry v. Kernan*,

23  197 F.3d 1021 (9th Cir. 1999).  In each of those cases, however, the court not only found that the

24  officers intentionally violated the defendants' *Miranda* rights, *but* also found that defendants'

25  statements were involuntary because they were coerced through the officers' repeated disregard for the

26  defendants' attempt to assert their rights and by the use of deceptive tactics that deprived defendants of

27  their free will.  Defendant asks the Court to extend the holdings in these cases to circumstances where

28  the officers engage in an alleged pattern of intentionally violating *Miranda* rights even though the

34

1  Defendant's statements were not involuntary.  There is no basis for such an extension.  *See Pollard v.*

2  *Galaza*, 290 F.3d at 1036, in which the court upheld the state court's finding that defendant's statement

3  was voluntary and stated: "Given the finding of voluntariness, we need not address the propriety of

4  purposeful violations of *Miranda* in other contexts.*"*

5        Based on the evidence in this case, it is debatable whether Detective Bodnar intentionally

6  violated Defendant's *Miranda* rights in order to obtain a statement that he knew could not be used in

7  the Government's case-in-chief, but which could be used to impeach Defendant and deter him from

8  testifying.  Although Detective Bodnar's advice of *Miranda* warnings to Defendant Toliver did not

9  comply with the requirements of *Miranda* under the Ninth Circuit's decision in *United States v. Noti,*

10  731 F.2d 610 (9th Cir. 1984), other circuits hold that equivalent warnings satisfy the requirements of

11  *Miranda*.  Detective Bodnar also recited the warnings very quickly, however, which is an indication

12  that he intended that the warnings be as ineffective as possible.  Defendant also provided evidence of

13  other instances in which Detective Bodnar gave inadequate *Miranda* warnings or allegedly violated

14  suspects' *Miranda* rights by continuing to question them after they had invoked their rights.  The

15  Defendant also established that there are *Miranda* warning cards and advice of rights forms which the

16  North Las Vegas Police Department manual recommends be used to effectively and properly advise a

17  suspect of his rights.  Detective Bodnar, however, chose not to use those cards or forms.  Defendant

18  established, at minimum, that Detective Bodnar is careless about providing proper *Miranda* warnings.

19  Such carelessness may, in fact, be intentional.

20        The Court also finds it somewhat incredible that an FBI agent would alter a *Miranda* advice of

21  rights form  as a "practical joke" and that Agent Shields would use the altered form approximately ten

22  times over a six-month period without realizing that it had been altered.  Agent Shields, however,

23  appeared to be fairly credible in his testimony explaining this matter.  Arguably, if Agent Shields

24  intended to obtain statements from Defendant in violation of *Miranda* which he knew could not be used

25  in the Government's case-in-chief, he would have dispensed with giving any *Miranda* warnings, instead

26  of reviewing the advice form with the Defendant and explaining to him that he had the right to remain

27  silent, that anything he said could be used in a court of law, and that he had a right to consult with an

28  attorney prior to and during questioning.

1    Even if the Court found that Detective Bodnar and Agent Shields intentionally violated

2 Defendant's *Miranda* rights, however, the penalty for such violation is limited to suppression of the

3 statements for use in the Government's case-in-chief.  The intentional violation of *Miranda* does not

4 bar the Government from using the Defendant's statements for impeachment purposes, absent a finding

5 that Defendant's statements were obtained through police coercion and were involuntary.   The

6 Government, therefore, is not precluded from using those statements for impeachment purposes.

7    <u>**CONCLUSION**</u>

8    The Court finds that Defendant Jonathan Toliver was not in custody on October 7, 2004 and his

9 statements made during the interview on that date are admissible against him at the time of trial.   The

10 Government has conceded that Defendant was not properly advised of his *Miranda* rights on January

11 15, 2005 and that his statement may not admitted in the Government's case-in-chief.  The Court further

12 finds that Detective Bodnar failed to properly inform Defendant of his *Miranda* rights prior to

13 questioning him on January 18, 2005, and his statement on that date is inadmissible in the

14 Government's case-in-chief.  Finally, the Court finds that Defendant's statements on January 15, 2005

15 and January 18, 2005 were otherwise voluntarily given, and therefore, those statements may be used for

16 purposes of impeachment if the Defendant testifies.

17    <u>**RECOMMENDATION**</u>

18    **IT IS RECOMMENDED** that Defendant Jonathan Toliver's Motion to Suppress (#33) be

19 **Granted,** in part, on the grounds that his statement on January 18, 2005 was obtained in violation of his

20 *Miranda* rights and may not be admitted as evidence in the Government's case-in-chief.  The

21 Defendant's Motion to Suppress should also be granted as to Defendant's January 15, 2005 statement

22 which the Government concedes was obtained in violation of Defendant's *Miranda* rights and may not

23 be admitted as evidence in the Government's case-in-chief.

24    **IT IS FURTHER RECOMMENDED** that Defendant Jonathan Toliver's Motion to Suppress

25 (#33) be **Denied**, in part, on the grounds that his statement on October 7, 2004 was given during a non-

26 custodial interview and may therefore be admitted in evidence in the Government's case-in-chief.

27    **IT IS FURTHER RECOMMENDED** that Defendant Jonathan Toliver's Motion to Suppress

28 (#33) be **Denied**, in part, on the grounds Defendant's statements on January 15, 2005 and January 18,

36

2005, although obtained in violation of *Miranda*, were otherwise voluntary, and therefore may be used for purposes of impeachment if Defendant testifies.

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 22nd day of December, 2006.

GEORGE FOLEY, JR.
UNITED STATES MAGISTRATE JUDGE